Pennsylvania 17-3244 Good morning, Your Honors. Michael Wolfe for the appellant. I would like to, if I may, reserve five minutes for rebuttal. Thank you. May it please the court. The fiduciaries of a retirement plan decide to include 58 mutual funds as investment options for participants to choose from for investing their retirement savings. Instead of choosing the cheapest share class that was available for those mutual funds, the fiduciaries chose a more expensive share class that cost participants money who wanted to invest in those particular mutual funds. Does that plausibly suggest that the fiduciaries did not act prudently? Is that your main complaint in this case, the selection of retail shares over investment shares when they were identical yet more expensive to maintain? Is that really the core of what your clients most upset about? No, Your Honor. The others are the fact that the expenses for keeping the records of the accounts for this retirement plan that TIAA and Vanguard received were excessive because the fiduciaries weren't monitoring how much they were receiving in payment from these mutual funds. Why do you say that failure to solicit competitive bids in and of itself is a breach of fiduciary duty? Why would that one event be a breach? And we don't say that. Failure to solicit competitive bids is indicative of lack of diligence on the part of the fiduciaries because it's fairly well accepted that the best way to get the cheapest cost for services rendered is by putting it out to bid. But if there are certain accounts, I don't know if you call them accounts, if you want to invest with certain funds like TIAA and Vanguard and they say, all right, you take our product, you've got to take our record keepers, doesn't that put you in a whole different category? Because is it your claim that the evaluation of the access to Vanguard and the access to TIAA was with the fees charged for that access was not a bargain for the fund? Well, yes, Your Honor, to a certain extent. But even in arrangements where it's a bundled type of setup where you get all of TIAA's mutual funds and TIAA keeps the accounts for those funds, you can negotiate with TIAA to get a refund of the excess revenue sharing that those mutual funds generate. And courts recognize that fiduciaries have to be aware of the revenue sharing that's being generated, have to be aware of what a reasonable record keeping fee would be if it were negotiated, and at least ask for a refund of the excess amounts. And TIAA and Vanguard both do that. And do you state that in your complaint? Yes, Your Honor, we do. And this is also something that came up in the Tussey case. And is your position that these figures exceed what is available for other funds of the type that the fund might want to invest in? Yes, well, that's certainly true as to the 58 mutual funds that had cheaper share classes, right? So for those, it's the exact same investment for less cost to the participants. So it's clear cut that it's the exact same investment, but it's just cheaper. And so that's in the interest of the participants. You know, one of the things that bothers me about this case is I gather there are four tiers of participants in the plan, ranging from the plan does all the planning for them to the participant makes all its choices on the basis of the information provided on what's available. And I gather you have no complaint about the information that's been made available. Yeah, that's true, Your Honor. So you're complaining about plans that cost too much, but you don't tell us to what level these plans were made available, to what level of investor, what level of employee these plans were made available. Right, so the four tiers that Your Honor is speaking of. How can you expect us, unless we know what tier you're talking about, whether this was a good investment or not? Well, there's a problem with that, Your Honor. The different share classes for the 58 mutual funds were not all offered in the plan. So participants had no choice as to whether they were going to have the lower expenses. But we don't know what tier was offered what. Well, Your Honor, it doesn't really matter. Well, I think it matters a great deal. Well, it doesn't matter in this sense, Your Honor, because these funds are effectively in tiers three and four. Tier one, and again, these tiers are just participants choosing which types of investment to invest in. Tier one is target date funds. You just put your money in there and you never look at it again because it's just going to be allocated. There's not an issue about share class differential for those funds. But in something like tier three or tier four where you have an S&P 500 index fund, the fiduciary selected one that costs seven basis points when the exact same fund was available for two basis points. Now, how is that in the participant's interest? Because there were other funds available, too, and the participant can see this fund is too expensive. I will not go there. But if you want the Vanguard 500 index fund, you have a single choice, and it is the more expensive choice. You had no opportunity to get the cheaper version of that fund, none whatsoever, because the fiduciaries didn't do their job by selecting the cheaper version of the Vanguard S&P 500 index fund. But that only affects folks who are in that tier three and four, based on what you're describing. Is there something from the complaint that we would have been able to glean that? That only tier three and four participants were affected by this institutional versus retail share issue? No, the complaint doesn't lay out what tiers each of these different investments are included in. And again, it's not relevant in this sense. The participant, a participant who wanted to invest in one of these funds, whether it's in tier two, tier three, or tier four, didn't have a choice as to the share class they were going to invest in. In other words, how much of their retirement savings was going to be taken in fees every year? That was a choice of the fiduciary. But they had a choice among various investments to see what the fees were for these and to pick an investment that had what they considered favorable fees as opposed to unfavorable fees. They were not being forced to invest in the funds that had the high fees. Your Honor, I as a participant want to invest in the Vanguard 500 Index Fund because I believe that that's a good investment. I have no choice as to whether I have to pay five basis points of unnecessary fees. But you can say, all right, the Vanguard 500 is too expensive. I'm going to look for among the other options that are made available. But the other options aren't 500 Index Funds. No one makes a choice. Yes, they are, but there's something else. You can decide what is available. This is a whole panoply of choices, and you can decide what is available. They're giving you the information on a good mix like we have in Renfro that you can make the decision, I want to put my money here or here or here. It's not sensible to make an investment decision based on the fee alone. So participants don't say, I'm going to find whatever investment it is out there that pays only five basis points. That doesn't make any sense. Participants decide, I want to be in the S&P 500 Index Fund because it's a large, broad-based equity, large capital end investment. I find that to be prudent for my portfolio. I want to invest in it. I have one choice. The Vanguard Index Fund pays seven basis points. Because of the fiduciary's failure and prudence, they did not provide me the option of investing in the two basis point fund. And over my retirement lifetime, I'm going to lose thousands of dollars because of the fiduciary. Except there are other choices you can make. But there's no other S&P 500 Index Fund. No, but there are other choices you can make. But that doesn't mean, that doesn't matter. That's what we learned, that if a good variety is presented, we are not going to get into individual determination of what a particular investment is going to offer. Doesn't that really go, I mean, what Judge Roth is asking you, doesn't it really dovetail into what this court said in Renfro? In Renfro, one of the reasons for the dismissal was that there was an offering of a reasonable mix and range of options. And in here, the appellees argue that there's even a better range of mix and there's a lesser expense ratio than there was in Renfro. So, I mean, how do you distinguish this case versus Renfro? Because Renfro pointed out the challenge was just the mix of investments that was in there. There wasn't an allegation of imprudence of any particular investments. We specifically alleged that specific investments were imprudent because they were available in cheaper share classes or had poor performance. That wasn't in Renfro. Renfro did not address the issue of the imprudence of putting in the more expensive share class of an investment option. And the Ninth Circuit in Tibble v. Edison held that that, in fact, is a breach of fiduciary duty. So this court is creating a circuit split by asserting that, no, that's not a breach of fiduciary duty, so long as you have some fund in there that's cheaper. Now imagine, your honor wants to invest in the S&P 500 index fund. It's going to cost you seven basis points. Well, you can invest in the money market fund instead that has no cost to it, or it's only one basis point in cost. Would it make any sense to say, well, you've got to invest in that cheap fund, but that has no performance, instead of the S&P 500 index fund, which is all of the large cap equities? Are those the only choices? No. It's a nonsensical choice. Because there are more choices. You aren't limited to those two. Right, but your honor is saying that just because you've got a one basis point fund in there, that's it, there's no breach. I'm saying because you have a variety of different investments with different benefits and different problems that, and we're talking about the retiree, the employee, is going to pay a lot of attention to what they're doing. If you present them with a good choice of options, that's what you're, under Renfro, that's all you need to do. Your honor is allowing fiduciaries to avoid the highest duties known to the law through the simple expedient of putting in 100 plus investment options and letting participants figure out which ones are the preferred ones. Well, these are the investors who want to figure it out, and you aren't complaining about the ones who say, do it for me. Well, let's leave out the targeting. We can't really figure out which ones you are talking about. I can state it very simply, your honor. Where is the S&P 500 index fund in this plan that pays two basis points and fees that allow me to have more retirement savings when I do retire from having invested in that fund? It doesn't exist because of what the fiduciaries did. Counsel, I'd like to ask you about TIA and Vanguard. I know we're over time, but I have a couple of questions, and I'm sure my colleagues might as well. Do you allege anywhere in the complaint that TIA and Vanguard had a relationship with the fund before they entered these agreements? I'm not sure what you mean by relationship with the fund. Okay, let me rephrase it. It's a prohibitive transaction question, so I'll target you into the law. Parties and interest, there's a point in time when one becomes a party and interest. At the time that the agreements were entered into with Vanguard and TIAA to provide services to the plan, there is no allegation there was a preexisting relationship. Correct, your honor. Okay. As a result, anything that happened to enter that agreement and the negotiation and the entry itself is not a prohibited transaction.   Then how can you persist in making prohibited transaction claims that either are that transaction or things that are happening pursuant to that transaction? When I say transaction, I'm talking about the agreement. So how do your prohibited transaction claims even survive here? Right, because part of the prohibited transaction claim is maintaining these arrangements with the record keepers, allowing plan assets to go pay excessive record keeping fees. The transaction that led to those defalcations you're discussing came as a result of one transaction, the entry of the agreement. Aren't your complaints about what happened as a result of entering the agreement just a repackaging of your breach claim? No, it's not, your honor, because as a Supreme Court held, fiduciaries have an ongoing duty regarding the plan's investment. But that's not a prohibited transaction cause of action. That's an ongoing duty, breach of fiduciary duty. We're in a different point of the statute. Right, but it's not any different because the transaction of allowing record keepers to take excessive fees out of the plan year to year are separate transactions. So how is the plan going to be able to deal with the people offering the investment plans once they have made an initial deal with them without engaging in prohibited transactions? So long as they have made reasonable arrangements and maintained reasonable arrangements with these providers, it won't be a prohibited transaction. But the pleading states that's something that the defendants are going to have to prove. So your definition of prohibited transaction is pretty broad. It's extremely broad, your honor, and that's the way Congress wrote the statute. Well, I'm not sure it is. A number of courts have said it is, your honor, and it would be a conflict among the circuits for this court to hold otherwise. We hold what we determine to be the best interpretation of the law. I understand, your honor, but then there's a conflict in the circuits. All right, well, let me ask you this. You say there's a lock-in agreement, right? The lock-in agreement can end. The fiduciaries can pull out, correct? Just for the record, you said yes.  I'm sorry, yes, your honor. Okay. Then how is it improper or a breach of fiduciary duty to be in an agreement that you can get out of? Just that one transaction, because a lot of the case law, and I'll tell you why I'm asking these very kind of slice-and-dice questions. A lot of the cases, and you are familiar with the fact this isn't the only one where there's a challenge to a university's plan. And many of the cases are slicing and dicing each of these events. With respect to the lock-in itself, is there a breach of fiduciary duty to enter a lock-in agreement that you can get out of? It's an interesting point, your honor. Arguably not. If a lock-in agreement was entered into more than six years ago, arguably it would be barred by the statute of limitations anyway. But the claim is not that the lock-in agreement itself was a breach. It's that fact is another fact that is on the pile of facts to show that the fiduciaries were not doing their jobs. In other words, because they have a lock-in agreement, it plausibly suggests the fiduciary said, well, we're going to have to monitor the performance of the CREF stock account, right, because we can't get out of it. Now, legally, yes, they could have gotten out of it, but they entered this agreement. They have it in their heads. Well, we've got to keep this in here anyway, so why monitor how it's performing? And so that's a fact. And we show facts that the CREF stock account, in fact, was a poor-performing investment, and any prudent fiduciary would have gotten rid of it as of the beginning of the limitations period that we're talking about. So you don't want us to follow the analytical structure of these other district courts, the district courts that have adjudicated this have followed. That is, they're making rulings on each one of these events. You're not asking us to, you want us to look at it as a totality, not identify any particular one as the breach, but say in totality this reflects a breach, at least at the pleading stage. Yes, Your Honor, because you have to look at the totality of the facts that are involved. And the facts alleged here are much more detailed and more specific than was alleged in Renfro. If I could ask you another question on prohibitive transactions. Yes, I'm sorry. One of your prohibitive transactions at paragraph 226, I didn't understand what you were saying, so I'll read the language and tell you what I thought you meant, and you can tell me actually what you meant. By placing investment options in the plan, in investment options managed by TIA, CREF, and Vanguard, in which the entirety of the plan's $3.8 billion in assets were invested. What is the prohibited transaction there? You can also say I'm not relying on that. Well, I mean, the prohibited transaction is what we lay out in A, C, and D. So plan assets are going to service providers, parties of interest. The service providers are getting fees as a result of that. So the service providers are providing services to the plan. Okay. So that's a prohibited transaction. I understand your position. Okay. And it's extremely broad. There's no question about it. Congress set up ERISA so that just about anything having to do with the plan is prohibited, except for some very limited exceptions. Let me just see if my colleagues have any other questions for you, and then we'll get you up on the boat. Okay, you can have a seat, and we'll have you back on the boat. Thank you. May it please the Court. My name is Brian Ortelier, and I represent the applees. This Court held in Renfro, and as I think the panel recognizes, that so long as the fiduciaries offer a sufficient mix and range of investment offerings in a participant-directed retirement savings plan, measured by the expense ratios of those investments, there's no plausible inference that somehow the fiduciaries' process was unreasonable under Twombly. Penn followed Renfro to the letter. Indeed, and as I think the panel has already recognized, the Penn lineup is significantly better than the Unisys lineup, and the expense ratios went down over time as the number of institutional share class offerings went up. How do you respond to your adversary's efforts to distinguish Renfro from their allegations? That is, they are making a challenge to specific types of investments, and they're relying on case law that says the fiduciary should examine each one, and more specifically, their contention is the breach occurred by not making available institutional shares, which are less expensive, and only making available retail shares, and therefore causing expenses to be too great. How do you respond to that? All right, well, again, in the first instance, Renfro, and I need to sort of set up a predicate, and then I'll address Mr. Wolf's argument. Renfro holds that a review in court like this one must look in the first instance as to whether and to what extent the plan makes available meaningful choices, meaning the range of investment options, including risk profiles, investment strategies, and associated fees. It's noteworthy, and I think I heard some echo of this from the panel, here fees are but one part of a four-part inquiry. Now, there's no claim, none whatsoever, nor could there be, that somehow the offerings were insufficient or not meaningful under Renfro, and there's no contention, and again, I think I heard this previously, that any participant could not create a diversified portfolio consistent with his or her age, risk tolerance, and objectives. And again, and now I'll contrast Renfro, and then talk about what Mr. Wolf says to try to get around Renfro. Again, the lineup is better. Unisys had 73 offerings on the lineup, ranging from 10 to 121 basis points. Here, Penn offers 78 options with expense ratios ranging from 4 to 87 basis points, significantly better than the Unisys lineup. In fact, 17 of the plan's 78 options charge fewer than 10 basis points, less than $1 for every 1,000 invested. I did get around your adversary's point, though, that there were identical shares available that would have cost less. The issue was squarely decided in Renfro, Your Honor. Renfro was about mix. Your Honor, basically, as I recall, if I recall correctly, 69 of the 73 offerings in Unisys were retail share class funds. But now we're talking about Unisys. Okay, the complaint, and I'm going to compare and contrast the two complaints, which I think is really the essence of this argument. The complaint in Renfro basically said, and we point this out in the brief, it alleged Fund A through Fund Z, there were institutional share class funds available. The only difference with this complaint, and I submit under Twombly, the result cannot turn on simply the length of the pleading. What they basically do here, take a look at the complaint. They say Fund A, there was an institutional share class offering. Fund B, there was an institutional. All the way to Z. It's the same complaint that was litigated and argued before this court in Renfro, except it's just longer. And I submit that, and I think this is important, and I heard strains of this a moment ago. So you're saying it's just longer, but you're also saying they need more than just length. They need something more. What more do you say they need besides length? I think to state an actionable claim in a case like this, I think the court's asking, what would the standard be? This much I know, and I'm not as enterprising or creative as plaintiff's lawyers, but I think in the first instance, whereas here you challenge all of the retail share class funds where there are institutional share classes available. You're moving towards Renfro, or Renfro is triggered. And clearly, I submit, and the court in Renfro, and I argued the case, recognized discretion is the hallmark of fiduciary activity. Oh, I'm sorry, I'm going to keep going. Can I just, I want Vanguard 500. I don't care what you offer. I want Vanguard 500, and you only offer it retail, and why can't I get it institutional? Let's be clear. And I have here one of the exhibits filed in the district court. The equivalent here in the Penn plan is called the Vanguard Institutional Index Fund. It's the same thing, slightly different name. It's four basis points. Again, you're paying for investment management basically for free, and the participants can choose that. Now, Mr. Wolf is essentially arguing he wants it at two basis points. And make no mistake, he makes the same argument as to every single fund in the lineup. But the funds are reticulated. They can't be looked at in isolation. The point is, in a revenue sharing model, it's the bundle of offerings that determine the amount of fees ultimately paid to the record keeper. How about it's uncapped for the same services rendered? I know we're going to off point, and we'll come back to that. Stay on your topic, and we'll get Judge Roth's answer, we'll get Judge Fisher's, we'll get mine. I'm sorry. Go ahead. So you were trying to say to Judge Roth, I think, something along the lines of nothing that really responded to her question. I think her question was if she wanted a particular type of fund, why can't she get that? Because it's the bundle of the reticulated offerings that determine and cannot, you can't, this is what the plaintiffs are trying to do. Renfro properly looks in a revenue sharing model at all of the component pieces together. So your answer to Judge Roth, your answer to Judge Roth then is I can't give you your Vanguard at that price because I've made a deal to get other investments available, and so sorry, yours is going to cost more money? No, what I'm saying is that there are consequences. In other words, if you pull out one of the fund offerings in a reticulated revenue sharing model, the fees have to be made up elsewhere, or you have to reduce the number of fund offerings. And isn't that a response to that's why we didn't breach our fiduciary duty because it was a thoughtful decision to have this combination available to the plaintiffs? And that's what Renfro tells us. That's the central premise of Renfro. And Renfro was decided five years before this complaint was filed. I submit, it's not just stare decisis principles. The ERISA fiduciary standards specifically say that the fiduciaries can take into account the circumstances around them. But how do you do that on a complaint? The plaintiff only needs to allege in one direction. Judge Fischer, go ahead. Well, I'm still trying to get an answer to my question. I'm sorry. I'm hoping you're maybe getting to my question. What more do they have to allege? Okay. I think, again, they would have to argue and there's any number of theories. I mean, part of what the plaintiffs are saying is that they have no redress here. If, in fact, you apply Renfro, that gives Penn license to do all kinds of terrible things to the participants. Make no mistake. In the Unisys savings plan line of cases, as opposed to Renfro versus Unisys, set out the framework for discrete fund underperformance challenges. There are two separate bodies of law in this circuit and I think it's fair to say that the plaintiffs are trying to conflate the two. But make no mistake. If you create a lineup, for example, that doesn't fit well or compare favorably to the Renfro lineup, happens all the time. Other circuit opinions, we say, are readily distinguishable. They offer but a handful of offerings at higher expense ratios. What this court did, again, in recognizing the participant's role in determining their own, in furtherance of their own objectives, and this do-it-for-me lineup, by the way, is these are target date funds part of them, meaning the asset allocation is determined for the participant. They're not all Wharton finance professors. I think that's clear. But back to Judge Fischer's question. I'm sorry. You're running out of time. Here's how you sue. Oh, I'm sorry. Here's the circumstances where you can sue. Again, not a particularly favorable lineup. It happens all the time in the other cases. You can also sue for inadequate disclosures. By the way, I heard, perhaps, a concession from the plaintiffs. The participants knew everything they needed to know to make their custom asset allocations. You might state a claim, like in Braden or Tibble, the Supreme Court case, when the plan sponsor benefited some way, an illicit relationship. It's important here to know that Penn pays enormous amounts in matching contributions, and that dispels any notion of some sort of disloyalty on their part. You would also have a claim, Your Honor, if the producer had set up, let's say in the first instance, a prudent mix and range consistent with Renfro, but neglected over time to monitor and make the changes needed, like Penn did here. Isn't that part of what they allege here? Your Honor, they say all sorts of things. It's a very lengthy complaint. But isn't that part of what they allege? I'm sorry, that we were not... Their overarching argument is Renfro doesn't apply. You cannot determine on 12b-6 that what we did was reasonable. So they're saying, effectively, we didn't monitor. But the duty of Renfro in this circuit is to offer that range. And from that... But is it a good range? I'm sorry? Is it a good range you're offering, or is it too expensive a range? Well, Your Honor, and again, what this court did in Renfro, and I argued the case, the idea was, what are we doing? A continuum. Again, those participants that want low-cost index fund investing can go there at four basis points at the low end. There are Wharton professors who believe in active investment management, the much more expensive end. This is the way the four tiers work. And that's available? It's available to everyone. I mean, the facilities management people, if so inclined, they can dabble in active management. You want a Vanguard 500 fund, but you say it's too expensive. Is there a comparable array of investments you can pick that would give you the same thing at the lower cost? There are 17 funds, and it's all spelled out in the record, under 10 basis points, basically free, including sort of the institutional equivalent of the Vanguard Index 500 fund at four basis points, which, by the way, he says you could get it down to two basis points. The fiduciaries are exercising discretion consistent with the statutory grant to set up these complex plans, which, by the way, I would be remiss if I didn't say these offer annuities. Annuities are enormously complex vehicles to administer. And notwithstanding the availability of these products on this lineup, and they are expensive to record keep, this range of expense ratios, the mix and range that this court is to look at is better. Can I speak to you now about uncapped revenue sharing? It's different than this mix of available investments. The complaint alleges that by having this uncapped revenue sharing that exists, it's allowing the fees collected and paid to the record keepers to increase for identical services. There's nothing changing. Why is that prudent? Well, Your Honor. And remember, I'm stuck with the pleadings. I can't take your defense. You know what I'm saying? I'm stuck with the pleadings. Why is that prudent? I'd like to think I haven't stayed true to the pleadings in the case or the record created in the district court. I submit that on the uncapped fees argument, precisely the same allegations and arguments were before this court in Rent Pro. What they said there was Unisys should have been at $70 per participant as opposed to $200 per participant. This court said, and I'm quoting here, 671F3rd at 327, their allegations concerning fees are limited to contentions that Unisys should have paid per participant fees rather than fees based on a percentage of assets. But that's the allegation, as I understand from the complaint, that they're not saying it should have been per participant. They're saying there should have been a cap of the revenue share. And if I'm misunderstanding the complaint, I'm happy to be corrected. But I didn't understand that to be their claim. Well, again, Your Honor, precisely the same arguments were rejected in Rent Pro. And again, they made the same thing, you know, whether it should have been capped at a number, $200 in Unisys. It's the same, precisely the same theory. And by the way, what they're basically saying at some level is that the revenue sharing model is imprudent. By the way, asset values go up and down. Using revenue sharing and the so-called uncapped fees, and especially you look at the events of 2008, 2009, you can't presuppose that forever and always the record keepers, the recipients of the revenue sharing, sort of, are being overcompensated. Over time, markets go up in participant direction, by the way. But again, that would be something that would be presented outside the pleadings to explain why the cap is not problematic, because it goes up and down. Well, I guess I suppose I'm asking the court to take judicial notice of the fact that markets go up and markets go down. I'll talk to you a little bit about the pleading standard that was applied by the district court. I'm sorry? I would like to talk to you about that. I'm going to go back to plain old civil procedure. Okay. In the district court, there's a number of times where the district court, one could argue, tries to provide an explanation for why it was good business practice to bundle, or it was a good business practice to have two record keepers, because they had access to the unique information for their respective plans. Didn't the court really go outside of what it's permitted to do? Now, I'm aware in Tombley, which was an antitrust case, the Supreme Court applied that sort of, is this conduct consistent with unilateral, you know, coincidental activity or is it conspiratorial activity? But we know that there's another circuit, the Eighth Circuit, that said you don't apply that sort of prism to evaluate an ERISA case. Didn't the district court err just at that point by the standard that it applied in evaluating the pleadings? Just a couple of observations, Your Honor. I respectfully submit, and certainly the court knows that it can affirm on any basis, to the extent that Judge Prater painted outside the lines, it's immaterial to the outcome. If you look at the guideposts firmly established in Renfro, and by the way, some of the observations she made, for example, bundling. Bundling was recognized in Renfro. In other words, there are evolving principles between the Renfro opinion, Hecker versus Deere, upon which Renfro was decided. These are, at this point in time, there are certain assumptions that I think almost rise to incontrovertible facts in these circumstances. And I don't think, frankly, the participant plaintiffs have made much of an argument here that Judge Prater has exceeded her authority in that regard in terms of, sort of, again, looking at something outside of the universe. Again, the suggestions about what's going on in the marketplace. It's not particularly earth-shattering, the notion that these types of transactions are common. The case law is suffused with these points. Let me, if I could have one moment more. Let me just see if my colleagues, do you have any other questions for counsel? Any other questions? Okay. I think we've heard your argument and we appreciate it. Can I make one, you got to go over, one last point. Go right ahead. I strongly commend to this court, the other day, there was a bench trial on all of these claims in the Southern District of New York. After hearing all the same theories, all the same experts, the court entered an opinion in favor of the defendants. I'll just give the court the site and make one point. 2018 Westlaw 3629598, NYU. This is important and I,  Sacrio? Sacerdote. Thank you, Sacerdote. Go ahead, you can make a point. One point. The second unit of the savings plan opinion of this court specifically says that a district court opinion speaking to the prudence of an investment or practice is itself evidence of objective prudence and that Penn followed what a district court judge after a lengthy trial with their experts, same record keepers, precisely the same discrete fund challenges. Court concludes all of these practices were prudent and the investments objective prudent and that under the use of savings plan is additional evidence of objective prudence. Thank you. Thank you. Judge Schwartz, on that last point, you're correct. The district court believes that recovery in our case is going to be very remote and unlikely in the court's opinion and an actual proof of our facts are improbable in our court's opinion, in that court's opinion. But that's not the standard on a pleading. Right? As this court itself said, a well pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable and that a recovery is very remote and unlikely. Fowler versus UPMC shady side. Judge Petter may not think we're going to win a trial but that's not the standard to apply on the sufficiency of a pleading to state a claim. Counsel's incorrect regarding the Tibble case. The decision was not made about the imprudence of using more expensive classes of mutual funds because the sponsor benefited. In fact, the district court specifically held that the fiduciary did not make their higher cost share class selections for the purpose of benefiting their employer. So that was not part of the case. Even without any intent to benefit the employer choosing the more expensive version of a mutual fund. More expensive share class is a breach under Tibble. The Renfro complaint doesn't compare to the Suida complaint. If your honor would just look at appendix pages 88 through 96 your honors would see a long chart of the specific mutual funds that had specific share classes that were much cheaper than what the fiduciaries offered. Compare that to the Renfro complaint that starts on appendix page 288 you'll see no such allegation. Nor any allegation regarding failure to put the services out to bid. No allegation of what the record keeping fees were paid out of the Renfro plan, the Unisys plan. Nor any allegation about what a reasonable record keeping fee would have been. Can I ask you about why you mentioned record keeping? You have an allegation in the complaint that says two record keepers was costly and inefficient. Yes. I didn't see any facts to tell me how it was inefficient. I saw a series of paragraphs that talk about how other universities have chosen to use one record keeper and they have found a benefit from that but I don't even know what that benefit is. Right. So what is the factual basis for that claim to be a breach of fiduciary duty by using two record keepers because it's quote costly and inefficient? Isn't that too conclusory to even satisfy Twombly? Well, if that were the only allegation in the complaint, yes, that probably would be. But that coupled with the fact that the sources that we quote say that it's cheaper to have one record keeper and that a number of universities went to a single record keeper and realized savings to the plans from that in combination show that that's a proven course and not doing that suggests plausibly an unproven course. Record keepers have fixed costs naturally so two record keepers are going to have to combine more fixed costs. Your focus is on savings, not inefficiencies, although you use the language inefficient more than once in the complaint. Yes, Your Honor. In my opinion, that's synonymous. Thank you. Is count one of your complaint time barred? No. Why not when the agreement was entered into prior to December 31, 2009? Because it is the ongoing keeping in of those investment options despite their underperformance. That is the breach. So the fiduciary is responsible for what funds stay in the plan. They're keeping them in the plan over time. So that's the breach. If it were just you entered into a lock-in agreement more than six years ago, that would be time barred, Your Honor. Yes. So any of the agreements entered into over more than six years back, would be barred. If the claim were just about entering into that agreement. And that's not what our claims are in this case. Judge Schwartz, on the record-keeping fee aspect, I got off track in my opening statement, but I just want to make one clear distinction. We're not saying just because they failed to put the services out to bid that that's a breach on its own. It's that coupled with the fact that they could have been paying only 35 basis points per participant and were paying well over $200, not basis points, $35. Were paying well over $200 and therefore there's evidence that in fact they were causing overpayment. It was those facts in George versus Kraft Food Global in the Seventh Circuit on which the Court of Appeals reversed the summary judgment for the defendants. I didn't understand and I made this observation to your officer so I want to make sure I understand your pleading. Your claim isn't that they should have used per participant methods of payment. There should have been a cap. And as I understood your allegation and your complaint, you were giving us that $700,000 to $750,000 range as an example of what would have been reasonable for this number of people in a plan. Am I understanding your claim? That's correct, Your Honor. Record keeping varies by the number of participants, not by the amount of assets. So in negotiating a contract for $750,000 and then any revenue sharing that comes in from your mutual funds that exceeds that amount, you refund it back. There wasn't necessary repackaging of what your adversary had pointed out was said in rent fro that you don't have to do a per participant method of payment? Right. It's not a repackaging. So once you agree to that amount, you can allocate it among the accounts in the plan pro rata if you want. The higher dollar accounts are paying more of the record keeping fee and the smaller accounts are paying less of the record keeping fee or per dollar or however you want. But that per participant number is just the rate at which you negotiate the full contract amount to determine what a reasonable amount is and then get the excess revenue sharing that exceeds that amount as well. Thank you very much.